## In re REGIONAL BUILDING SYSTEMS, INC., Debtor.

### No. 93–5–7521–JS.

United States Bankruptcy Court, D. Maryland.

July 22, 2000.

Jay G. Ochroch, Prince Altee Thomas, Fox, Rothschild, O'Brien & Frankel, LLP, Philadelphia, PA, for Universal Suppliers, Inc.

Richard Goldberg, Shapiro & Olander, Baltimore, MD, for Debtor.

Debra Lee Allen, Linda V. Donhauser, Miles & Stockbridge P.C., Baltimore, MD, for the Plan Committee.

Karen H. Moore, Baltimore, MD, Assistant U.S. Trustee.

*DECISION RE MOTION OF UNIVER-SAL SUPPLIERS, INC. FOR AMENDMENT OF JUDGMENT PURSUANT TO FED.R.CIV.P. 59(e)*

S. MARTIN TEEL, Jr., Bankruptcy Judge, Sitting by Designation.

This is a contest between Universal Suppliers, Inc. ("Universal") and the Plan Committee which is administering the property of the bankruptcy estate of the debtor, Regional Building Systems, Inc. ("RBS"), pursuant to a confirmed chapter 11 plan ("the Plan"). Universal has moved for amendment of the judgment sustaining an objection of the Plan Committee to the classification of Universal's claim as a secured claim pursuant to RBS's schedules. For the following reasons, the motion will be denied and Universal's lien will be treated as extinguished by 11 U.S.C. § 1141(c) and the claim-preclusive effect of the Plan under 11 U.S.C. § 1141(a).

Universal says it neglected through oversight to assert its lien prior to confirmation of the Plan. But the order confirming the Plan cannot be vacated under the liberal provisions of Fed.R.Civ.P. 60 to permit belated assertion of Universal's lien. The order confirming the Plan could be revoked only if the order "was procured by fraud." 11 U.S.C. § 1144. Universal has not elected to commence the adversary proceeding required to pursue such revocation. *See* Fed.R.Bankr.P. 7001.

Instead, Universal argues that the Plan should not be held to have extinguished its lien under 11 U.S.C. § 1141(c) unless the Plan specifically mentioned the lien, and, alternatively, that the Plan does not bind Universal, based on due process grounds. The court rejects both arguments.

I

The court will accept Universal's factual assertions as true for purposes of deciding the objection without actually deciding whether the assertions are accurate.

In 1992, Universal and RBS entered into a consignment agreement whereby RBS granted Universal a security interest in certain materials used in the construction of homes (the "Collateral"). The security interest included the proceeds realized from the utilization of the Collateral by RBS. Subsequently, Universal filed financing statements to perfect its security interest in the Collateral pursuant to Maryland's version of the Uniform Commercial Code.

In November 1993, RBS filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (11 U.S.C.). RBS's Schedule D, filed in December 1993, listed Universal as the holder of a $358,871.71 claim, secured by collateral with a value of zero.[1] Accordingly, under 11 U.S.C. § 1111(a), the claim was deemed one for which a proof of claim had been filed. However, under 11 U.S.C. § 506(a),[2] the claim, as scheduled, was only entitled to allowance as an unsecured claim even though RBS acknowledged that a lien existed and even though Schedule D is entitled "Creditors Holding Secured Claims."[3]

---

1. Pursuant to the Official Forms, Schedule D is entitled "CREDITORS HOLDING SECURED CLAIMS." In one column, Schedule D of the Official Forms requires the *debtor to* state "DATE CLAIM WAS INCURRED, NATURE OF LIEN, AND DESCRIPTION AND MARKET VALUE OF PROPERTY SUBJECT TO LIEN." Then the debtor must list "AMOUNT OF CLAIM WITHOUT DEDUCTING VALUE OF COLLATERAL." Finally, the debtor must list "UNSECURED PORTION, IF ANY." Claims scheduled on Schedule D are simply those for which a lien is claimed.

2. Section 506(a) provides that a claim of a creditor secured by a lien on estate property is a secured claim to the extent of the value of such creditor's interest in the ... property, ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim.

3. As is evident from Schedule D itself (*see* n. 1, *supra*), scheduling a claim on Schedule D does not necessarily mean that the claim is entitled to allowance as a secured claim. Under § 506(a), if the collateral is worthless, the claim is not allowed as a secured claim at all.

An official committee of unsecured creditors was formed. Universal was a member of the committee. On several occasions, counsel for the committee acknowledged to Universal's representative that Universal held a secured claim, and informed him that if matters were discussed regarding unsecured claims that conflicted with Universal's secured interest, he would be asked to remove himself from the conversation. So Universal was fully aware that it had a lien claim in the case. And Universal had reason to pay attention to the lien: RBS's estate has substantial funds against which Universal now asserts its lien.[4]

Nevertheless, Universal failed to assert its lien until after the court had confirmed the Plan, which made no provision for Universal's lien. Universal points to upheaval in its own affairs as leading to this failure. In December 1995, Universal itself became a debtor under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Middle District of Pennsylvania. Neither the former management of Universal nor its general corporate counsel informed Universal's bankruptcy counsel about the consignment agreement or the financing statements. In August 1996, Universal filed two separate proofs of claim in RBS's bankruptcy case asserting an unsecured nonpriority claim in the aggregate amount of $358,871.71 (the same amount as RBS had scheduled), thus implicitly acquiescing in RBS's view (*see* n. 3, *supra*) that Universal's claim, though supported by a lien, was not entitled to be treated as an allowed secured claim.[5]

In May 1997, almost nine full months after Universal filed its proofs of claim, the court entered an order confirming the Plan. The Plan did not provide for Universal to retain any lien.

The Plan, however, did specifically address the property upon which Universal might assert a lien. Universal was granted limited rights to share in that property, albeit not lien rights: in short, Universal became entitled (with other general unsecured creditors) to receive, after payment of certain other claims, a *pro rata* distribution from the estate's funds and the proceeds of the liquidation of the estate's other property.[6]

Because Universal had a lien against collateral, RBS was obligated by the Official Forms to schedule Universal on Schedule D. But at the same time, RBS made clear on Schedule D that it was scheduling Universal as an unsecured claim because the collateral had a value of zero.

Accordingly, the objection to Schedule D's treatment of the claim as secured is somewhat off the mark because Schedule D is entirely consistent with the Plan Committee's view of matters. But both parties have viewed the objection as seeking resolution of the dispute of whether Universal should be treated as holding claims entitled to allowance only as unsecured claims based on § 1141(c) having extinguished any lien Universal might have. Therefore, the court will decide that dispute.

4. In April 1997, the court approved a settlement of various claims of RBS against Aspen Knolls Corporation ("the Aspen Knolls Receivable"). This settlement resulted in a payment to RBS that month of approximately $5,000,000. Universal has not pointed to any other property upon which it asserts its lien attached, but if Universal's lien extended to other property, the Plan eventually confirmed in the case dealt with all such property as well as the Aspen Knolls Receivable. *See* n. 6, *infra*.

5. The court had established March 15, 1994, as the last date on which to file claims in RBS's chapter 11 case. But Universal's claim was already deemed filed by virtue of RBS having scheduled it. So RBS has an allowed unsecured claim in the case despite filing its proof of claim late. As will be seen, missing the claims-filing deadline was not enough to extinguish Universal's lien. Instead, failure of the confirmed Plan to address the lien led to its extinguishment.

6. The proceeds of the Aspen Knolls Receivable (*see* n. 4, *supra*) were first to constitute the Aspen Knolls New York Lienholder Distribution Fund, a separately segregated account. Plan ¶¶ 1.5 and 4.3. Only upon payment in full (or reservation of funds sufficient for payment in full) of each Allowed New York Lienholder Claim (defined in Plan ¶ 1.3 as a valid claim under Article 3A of the New York Lien

The Plan Committee was formed under the Plan to administer the properties dealt with by the Plan. In October 1997, the Plan Committee filed an objection to the classification of Universal's claim as a secured claim pursuant to RBS's Schedule D. Universal opposed the objection, contending that pursuant to its consignment agreement with RBS, Universal acquired a security interest in certain goods, and that the Plan Committee holds funds representing the proceeds of those goods.

In December 1997, more than 7 months after confirmation of the Plan, Universal filed an amended proof of claim asserting a secured claim of over $740,000. The amended claim attempts to reclassify Universal's claim as secured and seeks as part of the claim more than $380,000 in interest, fees, and other charges, in addition to the $358,871.71 originally claimed.

As noted previously, although the Plan Committee's objection was to the classification of the claim as secured on RBS's schedules, both parties are in agreement that the issue here is whether Universal should be permitted to assert its lien claim against the proceeds held by the Plan Committee.

## II

At the outset, it is important to clarify what this dispute does *not* involve. The court never determined that Universal's lien was worthless. Accordingly, the issue is not whether the court proceeded in a procedurally improper fashion to determine that Universal's lien was worthless. That thus distinguishes this case from cases in which the debtor, failing to bring an adversary proceeding to determine the

validity, priority, or extent of the creditor's lien as required by F.R.Bankr.P. 7001, proceeded instead to have the plan declare the lien to be worthless. *Deutchman v. Internal Revenue Service (In re Deutchman)*, 192 F.3d 457, 460 (4th Cir.1999) (part II(B)); *Cen–Pen Corp. v. Hanson*, 58 F.3d 89, 92–93 (4th Cir.1995) (part II(A)).

## III

Instead, the issue is whether, regardless of the validity, priority, or extent of Universal's lien, § 1141(c) and the doctrine of claim preclusion bar Universal from asserting that lien against the proceeds of estate property being administered pursuant to the confirmed Plan. The court considers first § 1141(c).

Section 1141(c) is an exception to the general rule, noted in *Cen–Pen*, 58 F.3d at 92, and *Deutchman*, 192 F.3d at 460, that liens pass through the bankruptcy process unaffected. Section 1141(c) provides:

> (c) Except as provided in subsections (d)(2) and (d)(3) of this section and except as otherwise provided in the plan or in the order confirming the plan, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors. . . .

Chapter 11 is the chapter primarily employed to reorganize businesses. Chapter 11 plans may (and as a matter of practical experience almost always do) deal with property of the estate. *See* 11 U.S.C. § 1123(a)(5)(A) (plan may authorize "retention by the debtor of all or any part of the property of the estate"), (B) ("transfer of all or any part of the property of the estate"), and (D) ("sale of all or any part of

Law allowed pursuant to a final order of the court) were proceeds of the Aspen Knolls Receivable to be placed in the Creditor Distribution Fund. Plan ¶ 1.5 and 4.3. The other funds of the estate, including proceeds of estate assets liquidated under Plan ¶ 4.2, were placed at the outset in the Creditor Distribution Fund. Plan ¶ 1.10. Only after payment of (or the setting aside of a reserve for) all other claims—including post-confirmation liqui-

dation expenses; claims of administration under 11 U.S.C. § 507(a)(1); non-administrative priority claims under § 507(a)(3, 4, 5, 6 and 7); and, to the extent allowed as such, the secured claim of International Building Group, Inc.—were allowed claims scheduled or filed as unsecured claims (such as Universal's) to be paid on a *pro rata* basis from the Creditor Distribution Fund. Plan ¶¶ 3.6 and 4.6.

the property of the estate"). Moreover, plans sometime deal with property exempted from the estate under § 522. *See* § 1123(a)(6) (permitting exempted property to be used, sold, or leased under a plan if the debtor consents). Plans do not always deal with all property of the estate that existed under 11 U.S.C. § 541 upon the filing of the case. Occasionally, for example, selected properties may be abandoned under 11 U.S.C. § 554(a). Or estate property may have become exempt under 11 U.S.C. § 522(*l*) and the debtor may have elected not to dedicate the property to the plan.

■ But when a property is dealt with by a plan, the effect of § 1141(c) is plain: after confirmation of the plan, the creditor's liens on that property are extinguished if not expressly preserved. *See, e.g., In re Penrod,* 50 F.3d 459 (7th Cir. 1995); *Minstar, Inc. v. Plastech Research, Inc. (In re Arctic Enters., Inc.),* 68 B.R. 71, 79–80 (D.Minn.1986); *Board of County Comm'rs v. Coleman Am. Properties, Inc. (In re American Properties, Inc.),* 30 B.R. 239, 246 (Bankr.D.Kan.1983).

■ Section 1141(c) applies here. First, there has been an order confirming the Plan. Second, the proceeds [7] to which Universal looks for satisfaction of its claim were dealt with by the Plan: Universal wants those funds distributed to it pursuant to its lien instead of being distributed in the manner provided by the Plan. Third,

§ 1141(c) plainly renders the property free of Universal's claims and interests (except for its right under the Plan to receive payment pro rata without any lien securing that right). This includes Universal's lien: a lien falls within the embrace of "interests" because a lien is defined to mean "charge against or interest in property to secure payment of a debt or performance of an obligation." 11 U.S.C. § 101(37).[8] Fourth, the Plan itself and the order of confirmation made no exception to the general effect of § 1141(c) in order to preserve Universal's lien.

But Universal contends that § 1141(c) must be interpreted as requiring that the lien itself have been dealt with by the Plan for § 1141(c) to apply. The court addresses that argument next.

### A.

■ The court begins its analysis by examining the statutory language. *See United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) ("The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.' ") (citation omitted); *see also Maryland State Dep't of Education v. United States Dept. of Veterans Affairs,* 98

---

7. The Plan spelt out the disposition of all of the estate's monies and deposits, as well as the disposition of the proceeds of the liquidation of all other estate assets. They were to be distributed to pay administrative claims, expenses of liquidation and plan administration, and claims of creditors, either through the Aspen Knolls New York Lienholder Distribution Fund (Plan ¶¶ 1.5 and 4.3) or through the Creditor Distribution Fund (Plan ¶¶ 1.10, 1.25, 4.5, and 4.6). *See* n. 6, *supra.* So the property upon which Universal might assert a lien is part of "the property treated under the plan" within the meaning of § 1141(c).

8. Sometimes what Congress has in mind in referring to interests is the equity interests of the debtor's shareholders. *See* 11 U.S.C. § 1129(b)(2)(B)(ii) (treating "interests" as op-

posed to unsecured claims and secured claims dealt with by § 1129(b)(2)(B) and (C)); *Citicorp Real Estate, Inc. v. PWA, Inc. (In re Georgetown Bldg. Assocs., L.P.),* 240 B.R. 124, 138 (Bankr.D.D.C.1999) ("the term 'interest' is ... universally understood to mean an equity interest in the debtor"). But as *Arctic Enterprises* discusses in detail, Congress also uses the term "interests" elsewhere in the Bankruptcy Code as referring to liens on property. The term as used in § 1141(c) should be read as encompassing both liens and equity interests because the focus of § 1141(c) is freeing the property of all entities' rights—secured or unsecured, creditor's or shareholder's—except as provided by the plan. *See Arctic Enters.,* 68 B.R. at 79.

F.3d 165, 168–69 (4th Cir.1996), *pets. for cert. denied,* 522 U.S. 806, 118 S.Ct. 43, 139 L.Ed.2d 10 (1997).

■ Universal's argument fails first to demonstrate any ambiguity in § 1141(c) under the three-part test of *Robinson v. Shell Oil Co.,* 519 U.S. 337, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997):

> The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.

*Robinson,* 519 U.S. at 341, 117 S.Ct. 843.

First, the language "the property dealt with by the plan is free and clear of all claims and interests of creditors" is insusceptible, standing by itself, of being interpreted as meaning that the lien is discharged only if the lien was provided for by the plan (meaning, as held in *Cen–Pen* and *Deutchman,* that the plan expressly acknowledged and specifically dealt with the lien). Under that interpretation, § 1141(c) would be rewritten as providing that "a lien provided for by the plan is free and clear of the lien" if not expressly preserved—plainly an absurd way of speaking that Congress could not have intended.

Second, the specific context in which the language is used does not suggest an ambiguity. As already observed, chapter 11 plans deal with property (including the possible transfer of the property) as well as claims. Section 1141(c) focuses on the property being dealt with by the plan as the first criterion for lien extinguishment, not on provision for the claim.

Third, the broader context of the Bankruptcy Code as a whole, with chapter 11 being the chapter employed for business reorganizations in which it may be necessary to transfer properties of the estate, suggests that the intention was to focus on the property being dealt with as the criterion for lien extinguishment under chapter 11, not whether a lien was specifically provided for by the plan.

The plain language of § 1141(c) ends the dispute, unless Universal shows that an exception to the plain meaning rule applies to permit disregarding the statute's plain meaning. *See Maryland State Dep't of Educ.,* 98 F.3d at 168–69. Universal must show that the plain language of § 1141(c) leads to absurd results, is demonstrably at odds with Congressional intent, reflects an obvious drafting error, or show some other reason why § 1141(c) ought not be applied the way it is written.

### B.

Universal attempts to meet this burden by arguing that § 1141(c) ought to be interpreted in a manner avoiding an inconsistency in lien extinguishment in chapter 11 versus chapter 13, citing *Cen–Pen* and *Deutchman.* But those decisions did not interpret § 1141(c). Instead, they applied 11 U.S.C. § 1327(c), a provision differing in critical respects from § 1141(c). Section 1327(c) provides:

> (c) Except as otherwise provided in the plan or in the order confirming the plan, the property vesting in the debtor under subsection (b) of this section is free and clear of any claim or interest of any creditor provided for by the plan.

As *Cen–Pen,* 58 F.3d at 93–94 (part II(B)), and *Deutchman,* 192 F.3d at 461 (part II(C)), make clear, the requirement in § 1327(c) that the lien interest of the creditor be "provided for by the plan" is not satisfied by mentioning the lien or claim and treating it as unsecured. Instead, "[a]s, a general matter, a plan 'provides for' a claim or interest when it acknowledges the claim or interest and makes explicit provision for its treatment." *Cen–Pen,* 58 F.3d at 94 (citation omitted). Similarly, "in order to 'provide for' a creditor for purposes of § 1327(c), the plan must, at a minimum, clearly and accurately characterize the creditor's claim throughout the plan." *Deutchman,* 192 F.3d at 461.

Universal contends that § 1141(c) and § 1327(c) address an identical topic—lien extinguishment—and should be applied in a consistent, harmonious fashion. The court disagrees. The focus of § 1141(c) is whether the property that is subject pre-confirmation to the lien is dealt with by the plan. In contrast, the focus of § 1327(c) is whether the creditor's interest—its lien—is provided for by the plan.

It is not sufficient for Universal to contend that § 1141(c) and § 1327(c) ought to work in the same fashion. By using plainly different language, Congress clearly intended different approaches to lien extinguishment in chapter 11 versus chapter 13. Universal would have to show that taking different approaches yields an absurd result. This it has not done.

Indeed, there are obvious reasons why Congress would have treated lien extinguishment in chapter 11 differently from chapter 13.

First, chapter 13 is generally a consumer bankruptcy chapter, there being relatively few chapter 13 debtors who are operating a business. Moreover, the debt limitations of 11 U.S.C. § 109(e) for chapter 13 eligibility assure that any chapter 13 case is unlikely to present complex business reorganization issues. In chapter 13, a debtor often elects not to deal with certain secured claims in the plan.[9] This is affirmatively contemplated by 11 U.S.C. § 1325(a)(5).[10] When a secured claim is not addressed by the plan, § 1327(c) states what is made obvious by the provisions allowing the claim not to be addressed by the plan: the secured claim passes through the case unaffected.

In contrast, chapter 11 is a more complex reorganization scheme, used principally by debtors operating businesses, and frequently used for large business reorganizations with various competing creditor constituencies. Chapter 11 has no provision comparable to the default rule of § 1325(a)(5) that secured claims may simply not be addressed by the plan.

Instead, chapter 11 contemplates that there will be voting on the plan by the classes whose rights are impaired by the plan. Chapter 11 requires that all claims (other than certain unsecured priority claims) be placed in classes, whether those claims are impaired by the plan or left unimpaired by the plan. § 1123(a)(1, 2, 3). In the case of a class of impaired claims, the plan must specify the treatment of the class of claims. § 1123(a)(3). In the case of a class of claims designated as unimpaired, the nonbankruptcy rights to which the claim entitles its holder remain unaltered (with exceptions of no relevance to this analysis). 11 U.S.C. § 1124(*l*). But treatment of a claim as unimpaired requires an affirmative statement in the plan that the claim is left unimpaired. In the absence of express treatment of the claim as unimpaired, the treatment (including any preservation of a lien securing the claim) is limited to that treatment of the claim specified by the plan.

So if a lien is to be dealt with outside the plan in chapter 11, the method for accomplishing that is to specify that the secured claim, including the lien securing the claim, is left unimpaired (or to abandon the collateral to the debtor prior to or as part of confirmation). With chapter 11 not containing a provision similar to § 1325(a)(5), Congress elected for § 1141(c) to speak in terms of property dealt with by the plan as effecting lien extinguishment unless the plan expressly provides otherwise. Congress could readily have addressed chapter 11 lien extinguishment in terms of whether

---

**9.** A common example is that the debtor addresses the home mortgage under the plan but elects not to provide for the secured car note obligation under the plan.

**10.** Section 1325(a)(5) requires that "with respect to each allowed secured claim provided for by the plan" certain conditions be met for the plan to be confirmed. It should be contrasted with § 1325(a)(2), which requires the plan to provide for full payment of unsecured claims entitled to priority.

the lien was specifically provided for by the plan, as in § 1327(c), but chose not to do so.

Second, chapter 11 contemplates more active involvement by creditors.[11] In chapter 13, creditors do not vote on a plan. In contrast, voting on a plan is central to chapter 11. 11 U.S.C. § 1126. To make an informed voting decision, creditors— particularly holders of unsecured claims— must know what property is being devoted to the plan and what liens on that property are being preserved by the plan and, if so, how they are being treated.

Looking from the viewpoint of the holders of secured claims leads to the corollary observation that a chapter 11 case is similar to an interpleader proceeding: creditors who may have a lien on property dealt with by the plan are required to assert those liens if they wish to have the lien preserved and must be vigilant that the plan is according the treatment to which they think they are entitled. If they do not, then other creditors who have relied upon there being no lien asserted, are entitled to have the confirmed plan carried out without any effect being given to assertion of the lien.

Finally, chapter 11 often entails refinancing or a transfer of the debtor's business. In contrast to 11 U.S.C. § 1322 ("Contents of plan"), § 1123(a)(5)(B) and 1123(c) expressly contemplate that the plan may transfer property of the estate and (with the debtor's consent) exempt

property. It is important for the financier or the purchaser of such property to know that the property will be subject only to those liens expressly preserved by the plan.[12] Such property is dealt with by the plan just as much as is estate property vesting in the debtor by reason of 11 U.S.C. § 1141(b)[13] and being retained by the debtor instead of being transferred. Section 1141(c) is written in terms of "the property dealt with by the plan," whereas § 1327(c) is limited to "the property vesting in the debtor under subsection (b) of this section."[14] This difference can be attributed to Congress's awareness that chapter 11 plans sometimes transfer property. Congress further adopted a rule in § 1141(c) that liens are extinguished in chapter 11 (unless the plan or confirmation order says differently), a matter of considerable importance to entities purchasing the property under the plan.

It is entirely sensible that Congress would have focused lien extinguishment in chapter 11 on whether the property subject to the lien has been dealt with by the plan, not on whether the lien was specifically provided for by the plan. As long as creditors have been given notice of the case, they ought to be in a position to assert any lien rights they have. Despite the complexity of the debtor's property affairs, a purchaser can gain some assurance that it will not have to contend with lien disputes (other than those preserved by the plan or the order confirming the plan) by satisfying itself that creditors

11. The court assumes that Congress was sensitive to the comparatively greater volume of chapter 13 bankruptcy cases and the comparatively smaller amounts at stake in chapter 13 cases. Congress could well have intended to protect secured creditors in chapter 13 cases from having to expend unwarranted resources protecting their liens when a plan does not clearly acknowledge and specifically treat the creditor's lien. That observation may underlie the approach taken by the Fourth Circuit in *Cen–Pen* and *Deutchman*.

12. Section 1141(c) does not vary in operation depending upon whether the plan continued the debtor's business or, instead, was a liqui-

dation plan. So it is irrelevant that the Plan here was a liquidation plan instead of a reorganization plan continuing or transferring RBS's business.

13. Section 1141(b) provides that "[e]xcept as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor."

14. As does § 1141(b), section 1327(b) provides that "[e]xcept as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor."

with potential lien claims have been given notice of the case. Giving a purchaser that assurance maximizes the amount that the estate will be able to obtain for its assets. A purchaser would unlikely be willing to pay as much for property if there were the potential for lien claims being asserted by creditors who had notice of the case but whom the plan and confirmation order treated as unsecured. Even if the lien claim were bogus, the specter of the costs of litigating the lien claim dispute would alone act as a depressant on the amount purchasers would be willing to bid for the assets.

Universal's argument thus neither raises an ambiguity in § 1141(c) nor demonstrates any reason why § 1141(c) ought not be applied as plainly written.

## C.

Even if the statute were ambiguous, the legislative history to § 1141(c) would support applying it as written. The Bankruptcy Act provisions that were forerunners to § 1141(c) are Bankruptcy Act §§ 226 and 474 (11 U.S.C. §§ 626 and 874 (1976 ed.)), applicable, respectively, to chapter X corporate reorganization cases and chapter XII real estate arrangement cases. These Bankruptcy Act provisions plainly operated as the provisions of § 1141(c) are written. No evidence exists that in enacting § 1141(c), Congress intended to change how this aspect of bankruptcy cases had been handled under the Bankruptcy Act. For example, § 226 provided:

> The property dealt with by the plan, when transferred by the trustee to the debtor or other corporation or corporations provided for by the plan, or when transferred by the debtor in possession to such other corporation or corporations, or when retained by the debtor in possession, as the case may be, *shall be free and clear of all claims and interests* of the debtor, creditors, and stockholders, *except such claims and interests as may otherwise be provided for in the plan* or in the order confirming the plan or in the order directing or authorizing the transfer or retention of such property.

(Emphases added.) Thus, § 226 addressed "the property dealt with by the plan" as distinct from the question of "claims and interests ... provided for in the plan."[15] Sections 226 and 474 included specific mention of property transferred or retained upon confirmation, thus clarifying that this is what is addressed by the phrase "the property dealt with" by the plan or arrangement.[16] These statutory forerunners, accordingly, are evidence that under § 1141(c), "the property dealt with by the plan" addresses the property being transferred or retained pursuant to the plan—not the matter of providing for claims or the liens securing such claims.

In contrast, chapter XIII of the Bankruptcy Act included no similar provision. A plan under chapter XIII could deal with

---

15. Similarly, § 474 provided:

> Upon confirmation of an arrangement, *the property dealt with by the arrangement*, when transferred by the trustee appointed under this chapter to the debtor, or to a trustee or corporation provided for by the arrangement, or, if no trustee has been appointed under this chapter, when transferred by the debtor to a trustee or corporation provided for by the arrangement, or when retained by the debtor, as the case may be, *shall be free and clear of all debts affected by the arrangement, except such debts as may otherwise be provided for in the arrangement* or in the order confirming the arrangement or in the order directing or authorizing the transfer or retention of such property.

(Emphases added.)

16. Indeed, the principal purpose of arrangements under chapter XII of the Bankruptcy Act was "the alteration or modification of the rights of creditors ... holding debts secured by real property." Bankruptcy Act § 406 (11 U.S.C. § 806(1) (1976 ed.)). And the term "debt" included secured claims. Bankruptcy Act § 406(2) (11 U.S.C. § 806(2) (1976 ed.)). So there can be no doubt that secured claims could be extinguished by a chapter XII plan.

secured debts. *See* Bankruptcy Act § 646(2) (11 U.S.C. § 1046(2) (1976 ed.)). But only as expressly provided by the plan could the plan have any binding effect on a creditor's secured claims. *See* Bankruptcy Act § 657 (11 U.S.C. § 1057 (1976 ed.)) ("the plan and its provisions shall be binding upon the debtor and upon all creditors of the debtor").

█ Congress, it must be assumed, intended to carry forward this differing treatment when it enacted the Bankruptcy Code. *See Cohen v. De La Cruz*, 523 U.S. 213, 219–20, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998); *Pennsylvania Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 563, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990) (noting that courts "will not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure"). Congress enacted § 1327(c) to provide that the property revesting in the debtor under § 1327(b) is free of a lien provided for by the plan except as otherwise provided by the plan. Whatever that may mean in the context of chapter 13, it is not evidence that Congress intended for chapter 11 to have a different rule of lien extinguishment than in the case of its statutory forerunners under the Bankruptcy Act.

### D.

This brings the court to the Seventh Circuit's *Penrod* decision which in dicta placed a questionable judicial gloss on § 1141(c). *Penrod* made § 1141(c) effective to extinguish the creditor's lien only if "the holder of the lien participated in the reorganization," 50 F.3d at 463, meaning that the creditor (or someone on its behalf)

filed a proof of claim. 50 F.3d at 461–62. This gloss was wholly dicta because the creditor in *Penrod* had in fact filed a proof of claim.

In any event, the gloss has been satisfied here. Universal not only filed a proof of claim but additionally affirmatively participated in the case by serving on the unsecured creditors' committee and by discussing its possible secured claim with counsel for that committee.

Further, the one factual distinction between *Penrod* and this case makes no difference. In *Penrod*, the creditor filed a proof of claim asserting secured status and the plan addressed the claim as an allowed secured claim, but it failed to preserve the lien securing the claim. Here, Universal filed proofs of claim asserting only unsecured status, and the plan failed to mention that Universal had a lien or that RBS had scheduled Universal's claim as secured (albeit by collateral of no value). But *Penrod* does not turn on that distinction.

By filing a claim and asserting only unsecured status, Universal elected to treat its lien as having no value. That Universal did this by reason of its failure to advise its bankruptcy counsel of its lien makes no difference. As in *Penrod*, it brought the full amount of its claim into active participation in the case and acquiesced, by failing to object, in no lien being preserved by the Plan to protect its claim. Placing the claim into play places all features of the claim into play, including any possible protection of that claim by way of liens.[17]

### E.

But even if *Penrod* could be read as requiring that the creditor must have a

17. The court in *Penrod* observed:

> As we have said, secured creditors commonly give up their preexisting liens for other interests in the reorganized firm. A plan of reorganization that does this "deal[s] with" the liens. Or does it? For it could be argued that the plan in this case dealt with the secured creditor's claim, but not with its lien. But this interpretation would be inconsistent with the rest of sec-

> tion 1141(c)—that the property dealt with by the plan is, after confirmation of the plan, to be "free and clear of all claims and interests of creditors" (and others). On the view pressed by Mutual Guaranty, the assets of the reorganized entity would continue to be burdened by secured creditors' claims by virtue of their liens even if the plan made provision for those claims.
> 50 F.3d at 463.

filed a claim noting its secured status, the preceding analysis demonstrates that *Penrod* would be erroneous on this score and, indeed, that *Penrod* is erroneous in requiring the filing of *any* proof of claim to render § 1141(c) operative.

■ The court declines to view § 1141(c) as requiring anything other than that the holder of the lien was a participant in the case by reason of having been given notice of the proposed plan's terms and the opportunity to object to confirmation of the plan. *Penrod* gave the following explanation for stating that the holder of the lien must have participated in the reorganization by filing a proof of claim:

If he did not, his lien would not be "property dealt with by the plan," and so the section would not apply. One could argue that the quoted phrase should [not include the creditor's lien because the phrase should] be equated to "property of the estate," defined in section 541 to include "all legal or equitable interests of the debtor in property as of the commencement of the case" (emphasis added), and that at the start of the bankruptcy the liens of the secured creditors are not the debtor's property—which indeed they are not. *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir.1984); *In re Interstate Motor Freight System*, 86 B.R. 500, 505 (Bankr.W.D.Mich.1988). But the suggested equation is not especially plausible. Property dealt with by the plan is property dealt with by the plan, whether it was part of the debtor's estate when bankruptcy was first declared or was tossed into the pot later.

50 F.3d at 463.[18] The apparent premises for the *Penrod* dicta are thus that a lien must be among the "property dealt with by the plan" for § 1141(c) to apply, and that only the filing of a proof of claim results in the lien being dealt with by the

plan. These premises do not withstand close scrutiny.

As to the first premise, neither of the cited cases supports a view that property of the estate does not include the portion of the property subject to a lien. *Moody* simply did not address whether a creditor's lien, defined by the Code as an interest in property, § 101(37), removes the property that is subject to the lien from the estate to the extent of that interest. And *Interstate Motor* expressly reached a result contrary to *Penrod's* first premise, stating, after careful analysis:

Liened property is property of the estate at the inception of the case under 11 U.S.C. § 541(a), and remains property of the estate until that lien is foreclosed upon or the property is abandoned.

86 B.R. at 505. *Accord In re Forrest Marbury House Assocs. Ltd. Partnership*, 137 B.R. 554, 556 (Bankr.D.D.C.1992). In fact, the author of *Penrod* seems to have taken this very view himself in *In re James Wilson Associates*, 965 F.2d 160, 171 (7th Cir.1992):

A security interest is—a security interest. It is not a fee simple. *United States v. Security Industrial Bank, supra*, 459 U.S. at 76, 103 S.Ct. 407. Metropolitan does not own a $6 million building or the rents that that building throws off month after month, year after year. It is just a creditor with a claim currently worth about $3.2 million that it has secured with liens against the building, and against the rents, to assure repayment.

The court referred to this as "the fundamental principle that a creditor obtains only a security interest and not a fee simple no matter how the parties denominate his interest." *James Wilson Assocs.*, 965 F.2d at 171.

Indeed, the very provisions at issue here, §§ 1141(c) and 1327(c), in conjunction with their companion provisions,

---

**18.** The language in brackets has been added to clarify that the statement that "one could argue" appears to refer to what a lien claim-

ant could argue to attempt to avoid the effect of § 1141(c).

§ 1141(b) and 1327(b),[19] clearly demonstrate that property is not excluded from the property of the estate to the extent subject to a lien. For purposes of § 1327(b), it makes no sense that a lien be viewed as excluding property from the estate. If it did, then § 1327(c) would be meaningless: the property vesting in the debtor under § 1327(b) would not include property to the extent subject to liens, and thus nothing would be gained by saying in § 1327(c) that the property vesting in the debtor is free and clear of liens (if the plan or confirmation order does not provide otherwise). Thus, property of the estate vesting in the debtor under § 1327(b) includes even the property the debtor owned upon filing the case that is subject to liens.

■ No different approach should apply in the case of property vesting in the debtor under § 1141(b), a provision using language identical to § 1327(b). Accordingly, the property of the estate vesting in the debtor under § 1141(b) includes property of the estate even to the extent subject to a lien. When such property has vested in the debtor by virtue of plan confirmation, it necessarily is "dealt with by the plan" within the meaning of § 1141(c) and includes the portion subject to liens. *See Northeast Office & Commercial Properties, Inc. v. Smith Valve Corp. (In re Northeast Office & Commercial Properties, Inc.)*, 178 B.R. 915, 927 (Bankr. D.Mass.1995).

■ A lien arguably constitutes a species of property for purposes of the due process and takings clauses of the Fifth Amendment of the Constitution. *See United States v. Security Industr. Bank*, 459 U.S. 70, 76–77, 103 S.Ct. 407, 74 L.Ed.2d 235 (1982). But as parts II(B) and (C), above, demonstrate, the Bankruptcy Code views a debtor's property encumbered by liens as nevertheless becoming property of the estate in its entirety, with the liens being merely something attached to the property. *See, e.g.,* § 1123(a)(5) (permitting sale of property of the estate "subject to or free of any lien"). Although the liens may be entitled to constitutional protection as a property right, that does not control the meaning in § 1141(c) of "the property dealt with by the plan." The phrase demonstrably means the entire property, regardless of the encumbrances on it.

■ The *Penrod* dicta's second premise—that a proof of claim must have been filed for the lien to be affected by the plan—makes no sense. A plan calling for the retention or transfer of specified property deals with that property, including the part encumbered by a lien, even if the lienholder did not file a proof of claim.[20] As will be seen later, nothing in the Bankruptcy Code requires that a proof of claim have been filed as a precondition to permitting the plan to deal with the property encumbered by the lien securing the claim.

*Penrod* made clear that it advanced the second premise of its dicta in an effort to harmonize § 1141(c) with the principle that generally liens pass through bankruptcy unaffected. The court observed:

> Our suggested interpretation reconciles the language of section 1141(c) with the principle, which we have pointed out cannot be maintained without careful qualification, that liens pass through bankruptcy unaffected. They do—unless they are brought into the bankruptcy proceeding and dealt with there.

*Penrod*, 50 F.3d at 463. But the statute as written, without the necessity of *Penrod's* judicial gloss, is not at odds with the principle. Yes, the lien creditor must have

---

**19.** Sections 1141(b) and 1327(b), identical in language, are quoted in nn. 13 and 14, *supra.*

**20.** This is true even in the extreme case of a lienholder who was given no notice of the case: the plan may be ineffective as to that lienholder as a matter of due process, but that is an issue distinct from the interpretation of the plain language of § 1141(c). As a matter of due process, that lienholder's claim and lien are not among those "claims and interests" to which § 1141(c) applies.

been brought into the case and dealt with by the plan, but surely this can be accomplished by giving creditors notice of the case and putting them on notice of the terms of any proposed plan and opportunity to object to the plan (including objecting to the consequences that § 1141(c) brings to bear when the creditor's lien is not preserved by the plan).

Congress gave no sign that it intended to require that the creditor have participated in the case by way of filing a proof of claim. As already observed, Congress intended that the debtor in chapter 11 could transfer property free and clear of all liens. If the purchaser faces the prospect of a contest over whether a lien encumbers the property purchased (because the creditor, despite full notice of the case, neglected to file a proof of claim and the debtor filed no proof of a secured claim for the creditor), the desirable goal of maximizing the amount realized by chapter 11 estates would be frustrated.

*Penrod's* view that liens bypass the bankruptcy or are brought into the bankruptcy via the filing of a proof of claim is based on the following passage:

A secured creditor can bypass his debtor's bankruptcy proceeding and enforce his lien in the usual way, which would normally be by bringing a foreclosure action in a state court. This is the principle that liens pass through bankruptcy unaffected. *Long v. Bullard,* 117 U.S. 617, 620–21, 6 S.Ct. 917, 29 L.Ed. 1004 (1886); *Dewsnup v. Timm,* 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992); *In re James Wilson Assocs.,* 965 F.2d 160, 167 (7th Cir.1992). If the creditor follows this route, the discharge in bankruptcy will not impair his lien.

*Dewsnup v. Timm, supra,* 502 U.S. at 416–17, 112 S.Ct. 773; *In re Tarnow,* 749 F.2d 464 (7th Cir.1984). Alternatively, he may decide to collect his debt in the bankruptcy proceeding, and to this end may file a proof of claim in that proceeding. 11 U.S.C. § 501(a)....

A secured creditor may be dragged into the bankruptcy involuntarily, because the trustee or debtor (if there is no trustee), or someone who might be liable to the secured creditor and therefore has an interest in maximizing the creditor's recovery, may file a claim on the creditor's behalf. 11 U.S.C. § 501(b), (c); *In re Lindsey,* 823 F.2d 189, 191 (7th Cir.1987)....

The secured creditor does not, by participating in the bankruptcy proceeding through filing a claim, surrender his lien. But this is not to say that the lien is sure to escape unscathed from the bankruptcy.

*Penrod,* 50 F.3d at 461–62. This view—that the lack of a proof of claim allows the secured creditor's lien to bypass the effects of a chapter 11 reorganization case—must be rejected as not supported by the decisions cited to support it. The court will address the five cases in turn.

In *Long v. Bullard,* 117 U.S. at 620–21, 6 S.Ct. 917, the Court addressed whether a lien was affected by either the bankrupt's discharge in a bankruptcy case or his exempting of the property as homestead property, and reached the same result as would be reached under the Bankruptcy Code, 11 U.S.C. §§ 522(c)(2) and 524(a)(2)—provisions that operate independently of § 1141(c). So *Long v. Bullard* adds nothing to the interpretation of § 1141(c).[21]

---

**21.** The creditor in *Long v. Bullard* elected not to assert a claim in the bankruptcy case by failing to prove up the debt (the equivalent of failing to file a proof of claim under current bankruptcy practice). The Court stated:

By section 5119 of the Revised Statutes the discharge releases the bankrupt only from debts which were or might have been proved, and by section 5075 debts secured by mortgage or pledge can only be proved for the balance remaining due after deducting the value of the security, unless all claim upon the security is released. Here the creditor neither proved his debt in bankruptcy nor released his lien. Consequently his security was preserved notwithstanding the bankruptcy of his debtor....The setting apart of the homestead to

Moreover, *Long v. Bullard* illustrates that the principle that liens pass through bankruptcy unaffected had its origins in straight bankruptcy proceedings (as opposed to reorganization proceedings). Under the Bankruptcy Act, reorganization proceedings were not even considered bankruptcy proceedings.[22] So the principle that liens pass through bankruptcy unaffected did not generally apply to reorganization proceedings which, as previously observed, plainly could affect liens.

The second decision cited, *Dewsnup*, involved the interpretation of 11 U.S.C. § 506(d), which specifies that certain liens are void.[23] Specifically, the issue in *Dewsnup* was whether a debtor in chapter 7, a non-reorganization chapter, could employ § 506(d) to reduce a lien claim to the value of the collateral that would be retained by the debtor after conclusion of the case—something that would have been contrary to prior bankruptcy practice. But § 506(d) does not purport to affect § 1141(c) or to be the exclusive means for avoiding liens.[24] *Dewsnup* itself recognized that although impairment of a lien via judicial valuation had usually been barred by the general rule that bankruptcy left liens unaffected, reorganization was an exception. *Dewsnup*, 502 U.S. at 416–17, 112 S.Ct. 773 ("Apart from reorganization proceedings, see 11 U.S.C. § 616(1) and (10) (1976 ed.) [Bankruptcy Act §§ 216(1) and (10)], no provision of the pre-Code statute permitted involuntary reduction of the amount of a creditor's lien for any reason other than payment on the debt.") Accordingly, courts have viewed the holding of *Dewsnup* as having limited applicability to chapter 11 cases. *See Wade v. Bradford*, 39 F.3d 1126, 1129 (10th Cir.1994) (agreeing "with the majority of courts considering this issue that '*Dewsnup*'s holding cannot be imported into Chapter 11 cases without eviscerating other key provisions and principles of that

the bankrupt under section 5045 of the Revised Statutes did not relieve the property from the operation of liens created by contract before the bankruptcy. *Long v. Bullard*, 117 U.S. at 620–21, 6 S.Ct. 917. But no exemptions are involved in our case (because RBS is not an individual), and even if exemptions were at issue, § 522(c)(2) would leave Universal's lien unaffected.

Moreover, the question of a discharge is wholly distinct from the impact of confirmation of a plan on liens. The issue of discharge is addressed in our case by 11 U.S.C. § 1141(d), not § 1141(c). It appears that RBS is not entitled to a discharge by reason of § 1141(d)(3). But even if confirmation of the plan did effect a discharge, § 524(a) ("Effect of discharge"), not § 1141(c), addresses that issue and the discharge has no effect on liens. Instead, a discharge impacts only the collection of the debt "as a personal liability of the debtor," not the collection of the debt via enforcement of a lien. *See Johnson v. Home State Bank*, 501 U.S. 78, 84, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991) (stating that "a bankruptcy discharge extinguishes only one mode of enforcing a claim—namely, an action against the debtor in personam—while leaving intact another—namely, an action against the debtor in rem").

22. *See* Bankruptcy Act § 114 (11 U.S.C. § 514 (1976 ed.)) (jurisdiction of court in reorganization proceeding "shall be the same as in a

bankruptcy proceeding upon adjudication"). Such cases could be converted into a bankruptcy case only by entry of "an order directing that bankruptcy be proceeded with." Bankruptcy Act § 236(1) and (2) and § 238(a) (11 U.S.C. § 636(1) and (2) and § 638 (1976 ed.)). And when the petition had been an original petition, the court was additionally required to enter an order "adjudging the debtor a bankrupt." Bankruptcy Act § 236(2).

23. Section 506(d) provides:

(d) To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void, unless—

(1) such claim was disallowed only under section 502(b)(5) or 502(e) of this title; or
(2) such claim is not an allowed secured claim due only to the failure of any entity to file a proof of such claim under section 501 of this title.

24. Instead, as *Penrod* itself notes, § 506(d) has the effect that "[i]f the secured creditor's claim is challenged in the bankruptcy proceeding and the court denies the claim, the creditor will lose the lien by operation of the doctrine of collateral estoppel. 11 U.S.C. § 506(d); *In re Tarnow, supra*, 749 F.2d at 465–66." 50 F.3d at 462.

reorganization chapter.' " (citations omitted)).

The third decision cited, *James Wilson Associates,* simply illustrates that secured creditors' liens are not always unaffected by the bankruptcy case,[25] and in dicta recognizes that a secured creditor becomes a participant in the bankruptcy process whether it files a proof of claim or not. 965 F.2d at 168 ("A secured creditor dragged into a bankruptcy proceeding against his will by the automatic stay provision of the Bankruptcy Code has a tangible financial interest in getting his security out from under the jurisdiction of the bankruptcy court so that he can foreclose it."). Just as the automatic stay of 11 U.S.C. § 362(a) applies even if no proof of claim has been filed, nothing in § 1141(c) makes it inapplicable simply because no proof of claim was filed by or for the creditor.

The fourth decision cited, *Tarnow,* actually strengthens the view that § 1141(c) does not turn on whether a proof of claim was filed. *Tarnow* involved a secured creditor who filed a late proof of claim. The bankruptcy court disallowed the claim as late, thereby preventing the creditor from receiving any payment to the extent that its claim was unsecured, but went even further and declared the lien void under an earlier version of § 506(d). No plan had been confirmed. Rather, the bankruptcy court apparently felt it important to use the bar date as a vehicle for determining what liens had to be addressed in the case. The court of appeals held that § 506(d) did not result in a voiding of the lien. *Tarnow,* 749 F.2d at 465.

So the upshot in *Tarnow* was that the creditor still retained a lien and could insist on fair treatment of that lien under any proposed chapter 11 plan: its still-extant lien could not properly be extinguished, over its objection to confirmation of the plan, by failure of the plan to mention the lien. But *Tarnow* did not address what would happen under § 1141(c) if such a plan were confirmed and the creditor took no appeal. If the plan specifically addressed the lien, the failure of anyone to file a proof of claim regarding the secured claim and the failure of the creditor actively to participate in the plan confirmation process would surely not have precluded § 1141(c) from being effective. Logically, the lack of any proof of claim should not alter the effectiveness of § 1141(c) when the plan makes no mention of the lien.

The final decision cited, *Lindsey,* involved the application of § 506(d) in a chapter 7 case, similar to *Dewsnup,* and contrasted the restricted ability of a chapter 7 debtor "to reduce the amount due on a mortgage" once the chapter 7 liquidation process was concluded with the liberal ability of a debtor to alter liens on property retained by the debtor under a plan in reorganization chapters. *Lindsey,* 823 F.2d at 191. As such, *Lindsey* adds no support to *Penrod's* second premise.

In addition to *Penrod's* dicta being based on unsound premises, that dicta would defeat the intended operation of other Code provisions. For example, *Penrod* is inconsistent with § 1111(a) in the case of claims the debtor has reason to dispute. Under the *Penrod* dicta, if a secured creditor, despite notice of the case, failed to file a proof of claim, the debtor would have to schedule the claim as undisputed or file a proof of claim on behalf of the creditor to permit extinguishment of the lien pursuant to § 1141(c).

**25.** The court affirmed orders permitting the use of the creditor's cash collateral thereby effecting an extinguishment of the lien in the cash allowed to be used. *See James Wilson Assocs.,* 965 F.2d at 167. In addition, the court affirmed the bankruptcy court's confirmation of a plan that dramatically altered the terms of the creditor's right to repayment from the building that also served as collateral. *See James Wilson Assocs.,* 965 F.2d at 172. The court viewed the case as illustrating "that the adage that liens pass through bankruptcy unaffected cannot be taken at face value. *In re Lindsey, supra,* 823 F.2d at 190–91." *James Wilson Assocs.,* 965 F.2d at 171.

Accordingly, *Penrod* was in error in suggesting that a proof of claim must have been filed for § 1141(c) to apply to the creditor's lien. Necessarily, therefore, it makes no difference that the proofs of claim here treated the claim as unsecured.

## IV

The court turns now to the issue of claim preclusion. Technically, it could be argued, the Plan here was required to address Universal's lien. Had Universal raised that objection, the Plan perhaps could not have been confirmed. But it did not raise that objection at the appropriate time. It is too late for Universal to raise that objection now and belatedly to assert its lien. Under § 1141(a), with exceptions of no applicability here, "the provisions of a confirmed plan bind ... any creditor ... whether or not the claim or interest of such creditor ... is impaired under the plan and whether or not such creditor ... has accepted the plan." As observed in *First Union Commercial Corp. v. Nelson, Mullins, Riley and Scarborough (In re Varat Enterprises, Inc.)*, 81 F.3d 1310 (4th Cir.1996):

> parties may be precluded from raising claims or issues that they could have or should have raised before confirmation of a bankruptcy plan, but failed to do so. More specifically, federal courts have consistently applied res judicata principles to bar a party from asserting a legal position after failing, without reason, to object to the relevant proposed plan of reorganization or to appeal the confirmation order.

81 F.3d at 1315 (citations omitted). Further,

> When all of the requirements for claim preclusion are satisfied, the judgment in the first case acts as an absolute bar to the subsequent action with regard to every claim which was actually made ... and those which might have been presented.... Once a plan is confirmed, neither a debtor nor a creditor can as-

sert rights that are inconsistent with its provisions.

*Varat Enters.*, 81 F.3d at 1317 (citations omitted). However, Universal's bankruptcy counsel claims it was unaware of Universal's lien claim. But that does not exempt Universal from the res judicata effect of the confirmed Plan. *See Varat Enters.*, 81 F.3d at 1316. In any event, as in *Varat Enterprises*, the creditor was aware of its claim (here, the entitlement to treatment as the holder of a secured claim) or should have been aware of the existence of the claim. Accordingly, Universal's assertion of secured status is barred by § 1141(a) and the res judicata principle of claim-preclusion it embodies.

Nothing in *Cen–Pen* alters this conclusion. The holding in *Cen–Pen*, 58 F.3d at 93—that a chapter 13 plan is res judicata only as to issues that can be raised in the less formal procedure for contested matters as opposed to those that must be decided by way of an adversary proceeding—has no applicability here. The Plan here did not seek to declare the lien invalid such as to necessitate the filing of an adversary proceeding. Liens not expressly mentioned in a chapter 11 plan are extinguished not as invalid but simply by operation of § 1141(c). In contrast, *Cen–Pen* interprets § 1327(c) as not permitting lien extinguishment when the chapter 13 plan fails to mention the lien. 58 F.3d at 94. Accordingly, *Cen–Pen* implicitly viewed the restrictions of § 1327(c) on lien extinguishment as embodying a congressional intention similarly to restrict the applicability of 11 U.S.C. § 1327(a) (the analog of § 1141(a)). When § 1327(a) is thus restricted, the statute plainly alters the traditional res judicata rule.

In any event, the Fourth Circuit appears to have retreated from any reading of *Cen–Pen* as restricting the res judicata effect of a chapter 11 order that extinguishes a lien. In *Spartan Mills v. Bank of America Illinois*, 112 F.3d 1251 (4th Cir.1997), the court of appeals addressed a "bankruptcy court's departure from estab-

lished procedure for adjudicating the priority of liens"[26] and whether *Cen–Pen* required denying res judicata effect to the bankruptcy court's orders. The court of appeals reasoned that under the holding of *Celotex Corp. v. Edwards,* 514 U.S. 300, 313, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995), the creditor

> cannot allow a final order that deprives it of a lien position to stand and then hope to attack it collaterally at another time. . . . The lien of a creditor is void if the unappealed, final order of a bankruptcy court vested with proper jurisdiction so declares regardless of the bankruptcy court's failure to adhere to normal bankruptcy procedures.

*Spartan Mills,* 112 F.3d at 1256–57.

## V

■■■ Universal additionally challenges the extinguishment of its lien on due process grounds. As long as RBS did not fraudulently hide from Universal its potential lien claim, the Plan here was not required to give Universal notice that it might assert a lien on some property of RBS, but only notice sufficient to alert Universal that it needed to protect whatever rights it might have against RBS's estate. *See In re Penn Central Transp. Co.,* 771 F.2d 762 (3d Cir.), *cert. denied,* 474 U.S. 1033, 106 S.Ct. 596, 88 L.Ed.2d 576 (1985) (creditors who discovered claims only after the bar date for filing claims were nevertheless barred from filing claims late on due process grounds: the debtor did not fraudulently hide the existence of the claims from the creditors). As observed in *Penn Central:*

> the purpose of the notice requirement is to advise individuals who will be affected by the outcome of any proceeding of the impending hearing so that they can take steps to safeguard their interests. The notice requirement is not necessarily in-

tended to advise them of the nature of those interests.

771 F.2d at 768 (citations omitted). RBS scheduled Universal as a secured creditor (albeit as one whose collateral had a value of zero), and the counsel for the creditor's committee affirmatively discussed with Universal's representative on the committee the possibility of Universal claiming secured status. So there was no fraudulent concealment that Universal had a lien. Universal was obligated to take an active role to protect its lien once it was on notice that the Plan, addressing Universal's monetary claim, accorded no lien to Universal to secure payment of that claim.

■■■ But Universal contends:
Clearly the Fourth Circuit has adopted a position that minimum procedural due process requires at least that an adversary proceeding be commenced to extinguish a lien. *See In re Keene,* 222 B.R. 511, 513 (E.D.Va.1998). See further, Eric S. Richards, *Due Process Limitations on the Modification of Liens through Bankruptcy Reorganization,* 71 Am.Bankr.L.J. 43, 83, 84 (1997) [ ("Richards") ].

Universal's Supplemental Mem. at 4. Although *Keene,* 222 B.R. at 513, adopted this position, the Fourth Circuit decisions *Keene* cites regarding due process, *Cen–Pen* and *Piedmont Trust Bank v. Linkous (In re Linkous),* 990 F.2d 160 (4th Cir. 1993), dealt with confirmed chapter 13 plans. The first of these decisions, *Cen–Pen,* addressed the requirement of an adversary proceeding in light of the limited reach of § 1327(a) and (c) to extinguish a lien (namely, that a lien is unaffected by the plan unless the lien is acknowledged by the plan and its payment is expressly addressed by the plan). *Cen–Pen,* 58 F.3d at 92–93 (part II(A)). The court in *Keene* read this part of *Cen–Pen* as establishing an adversary proceeding as a procedural due process requirement for extinguish-

---

26. *Spartan Mills,* 112 F.3d at 1256. In that case, a financing order (rather than an adversary proceeding) had been used to subor- dinate the creditor's lien and to order the sale of the property.

ment of liens in chapter 13; however, the court in *Cen–Pen* never mentioned due process. Rather, its analysis was based on the statute and the rules. *See* Richards, 71 Am.Bankr.L.J. at 85 (*Cen–Pen* was "based ... on a statutory analysis").

Even if *Cen–Pen* were a due process case, it would not apply on the facts of this case. The Plan here did not attempt to declare Universal's lien invalid. So no adversary proceeding was required. Instead, the Plan simply made no provision for the lien. And in chapter 11, in contrast to chapter 13, property dealt with by the plan is, by reason of § 1141(c), free of a lien if the plan does not provide otherwise.

The second decision *Keene* discussed, *Linkous*, dealt with a plan summary that was inadequate to notify the creditor that valuation of its collateral was addressed by the plan and that the creditor's claims would be treated as only partially secured.[27] Here, in contrast, the entire Plan was made available to Universal, and it had clear notice that no provision was made for a lien to secure its claim, which carried with it the consequence that the lien would be extinguished under § 1141(c).

Similarly, the due process holding in *Deutchman*, 192 F.3d at 461, does not apply here. The court of appeals viewed the plan as setting forth "[d]eceptive information"[28] such that there was not "specific notice to the IRS of Deutchman's intent to accord the liens less than full protection," thereby queering the plan's effectiveness under *Linkous*. *Deutchman*, 192 F.3d at 461. The Plan here was silent as to Universal's lien, but it was not deceptive: plainly no lien was being preserved by the Plan.

The Plan thus passed constitutional due process muster.

## VI

Universal's reliance on *Tarnow*, 749 F.2d at 465, and *FDIC v. Union Entities (In re Be–Mac Transport Co., Inc.)*, 83 F.3d 1020 (8th Cir.1996), is misplaced. The passages it cites from those decisions are necessarily taken out of context because no plan had been confirmed in *Tarnow*, and *Be–Mac* was a direct appeal of an order confirming a plan. Neither case involved the situation to which § 1141(c) and the doctrine of res judicata apply—a collateral attack upon a confirmed plan, as here.[29]

27. In *Linkous*, the notice of the chapter 13 plan—a mere summary—was totally inadequate to give the creditor notice that valuation of its liens on a mobile home and a car was at stake. The plan summary did not mention the car loan—so the car loan was not described as provided for by the plan such as to be affected by § 1327(c)—and described the plan's proposals as:

> 1) 36 months of $170 payments;
> 2) payment of 10% of unsecured debts;
> 3) $100/month payment by the Trustee to Piedmont for the mobile home; [and]
> 4) name, phone number, and address of person to contact with any questions regarding [the] plan.

*Linkous*, 990 F.2d at 161 (footnote omitted). The plan summary did not explicitly state that the secured loans would be treated as only partially secured—the implication being that the liens, as opposed to the claims secured by the liens, were not addressed by the plan and hence were unaffected by the plan because they were not provided for as a prerequisite

to lien extinguishment under § 1327(c). It is not surprising that the court held that the plan summary failed to give notice sufficient to comply with due process with respect to the plan's valuation of the collateral.

28. The plan in *Deutchman* contained conflicting directions as to how the IRS's claim would be handled. On the one hand, the plan recited that the liens of certain creditors (including the IRS) "shall be considered released and of no effect" upon the payment of all "Allowed Claims" due them. On the other hand, the plan—after initially seeming to require payment "in full" of the IRS's claim—apparently mandated by later provisions that the IRS receive only a discounted amount.

29. Universal additionally raises a red herring, contending that the Plan can be modified. If the Plan did not extinguish Universal's lien, no plan modification is necessary to protect Universal which could enforce its lien despite the Plan. If the Plan extinguished Universal's lien, Universal is not one of the entities enti-

*Conclusion*

The court will enter an order denying Universal's motion and clarifying that none of the property being administered under the Plan is subject to Universal's lien.

tled to seek modification. 11 U.S.C. § 1127(b). And Universal failed to seek, and indeed had no basis for seeking, revocation of the Plan under § 1144 as procured by fraud. In any event, no motion to modify the Plan has been filed, and the court agrees with the Plan Committee that once payments to creditors commenced (via partial payment of one secured claim), the Plan was substantially consummated and beyond modification.